Elvin **HELLMAN**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 21267.

United States Court of Appeals
Fifth Circuit.

Dec. 3, 1964.

Rehearing Denied Jan. 5, 1965.

E. David Rosen, Miami, Fla., Bernard R. Fleisher, New York City, Claude L. Eichel, Miami, Fla., for appellant.

Aaron A. Foosaner, Asst. U. S. Atty., William A. Meadows, Jr., U. S. Atty., Miami, Fla., for appellee.

Before JONES and GEWIN, Circuit Judges, and ESTES, District Judge.

GEWIN, Circuit Judge.

The appellant (defendant) was convicted in the United States District Court for the Southern District of Florida on three counts of an information charging him with wilful failure to file his individual income tax returns for the years 1956, 1957, and 1958. He was sentenced to imprisonment for twelve months on each of the three counts, the sentences to run concurrently. The trial court sus-

pended nine months of the sentence on Count 1 and the entire sentence on Counts 2 and 3, but the appellant was ordered to serve three months of the sentence on Count 1. A fine of $1,500.00 was also imposed. On appeal he specifies a number of errors, primarily relating to the unfairness which he alleges resulted from excessive participation by the trial judge in the questioning of witnesses and from his inaccurate characterization of the evidence. Defendant also asserts that the trial court erred in unduly restricting cross-examination of the Government agent by his counsel and in denying his counsel access to certain documents in the possession of the Government. After a careful review of the record, we conclude that the defendant's contentions are without merit, and we affirm the conviction.

 We do not find anything in the record, considered as a whole, which clearly indicates that the trial judge, in his questioning of the defendant, conveyed an impression to the jury that he was prejudiced against the defendant, disliked him, or believed that he was guilty. While the trial judge in a criminal case must be abundantly careful to refrain from becoming an advocate for the Government or from indicating a dislike or disbelief of any witness, particularly the defendant, he also has the prerogative—and often the duty—to insure that the facts are accurately brought out.[1] In the instant case the trial judge vigorously questioned the defendant while he was on the witness stand, but there is not a clear showing that prejudice resulted from the judge's interrogations. For example, the Government's evidence had strongly indicated that no income tax return had been filed in the defendant's name for the years in question. Shortly before the defendant testified, his brother, who had been associated in business with the defendant, emphatically denied that he had ever filed, agreed to file, or assumed any responsibility whatever with respect to the income tax returns or taxes of the defendant. When defendant took the stand, he testified that he knew his brother had filed returns and paid defendant's income taxes in each of those years. The trial judge vigorously examined defendant about this statement and warned him of the penalties for perjury.[2] Defendant now asserts that this

---

1. See United States v. Rosenberg (2 Cir. 1952) 195 F.2d 583, 594; United States v. Aaron (2 Cir. 1951) 190 F.2d 144.

2. "Now, in relation to the first paragraph of the letter, Mr. Hellman, did you personally sign an application for an extension for that year?
 "A. I don't remember; I might have.
 "Q. If you didn't sign it, was anyone authorized to sign it?
 "THE COURT: Wait a minute. You are leading the witness.
 "BY MR. ROSEN:
 "Q. Do you know whether he signed it?
 "THE COURT: He has already answered your question.
 "BY MR. ROSEN:
 "Q. Do you know if anyone else signed it for you?
 "A. My brother had power of attorney to sign for me and my sister when she was up in New York and would take care of things for me. Ruth used to commute between—
 "MR. FOOSANER: If the Court please, I object.

 "THE COURT: Strike it. Disregard that answer. Mr. Witness, answer the question. If you don't know, say you don't know. Don't speculate.
 "THE WITNESS: I am not speculating. This is a fact. I can prove it.
 "THE COURT: Why didn't you sign your income tax return?
 "THE WITNESS: Well, sir, this is the situation—
 "THE COURT: Or did you sign?
 "THE WITNESS: Sometimes I did. I don't remember. Which one are they talking about?
 "THE COURT: Did you pay your income tax for each of those years?
 "THE WITNESS: From the New York office, yes.
 "THE COURT: You paid by check?
 "THE WITNESS: No, I didn't pay it myself.
 "THE COURT: You swear your brother paid the income tax returns for those years for you?
 "THE WITNESS: Yes, sir.
 "THE COURT: And your sister?
 "THE WITNESS: Yes, sir.

cross-examination by the court conveyed to the jury the impression that the court felt that defendant was unworthy of belief. While the court's incisive interrogation of defendant on this point may well have been overzealous, if the dialogue between court and defendant is read in the context of the whole trial, we do not feel that it demonstrates the clear showing of prejudice which is necessary to establish an abuse of the trial judge's discretion in examining the defendant. See, e. g., Kowalsky v. United States (5 Cir. 1961) 290 F.2d 161. The witness had been somewhat recalcitrant and his answers evasive, and the record indicates that the trial judge was generally considerate of the defendant and his counsel, and maintained an attitude of fairness and impartiality. Furthermore, the court carefully instructed the jury that the accused is presumed innocent and that it is the jury's exclusive prerogative to resolve factual disputes and determine the credibility of witnesses.[3] In addition, we think the evidence was more than ample to sustain a conviction, even though proof of wilfulness could only be established by circumstantial evidence in the instant case. See United States v. Earnhardt (7 Cir. 1946) 153 F.2d 472. We also observe that the appellant's counsel interposed no objection to this colloquy between appellant and the trial court, and that he requested no special instructions relating to the matter.

■■ The appellant also charges that the trial court committed error in its biased and inaccurate characterization of the evidence. We have carefully examined the record and find no error in this regard.[4] Appellant also asserts er-

"THE COURT: Mind you, you are under oath, and you are swearing that you know that they were paid by him.
"THE WITNESS: Yes, and I have proof in writing to show that, too, sir.
"THE COURT: The income tax people have proof whether you paid it or not.
"THE WITNESS: I showed this to them, sir. They saw that. I wasn't trying to hide anything.
"THE COURT: You are sure you are telling the truth?
"THE WITNESS: Yes, sir.
"THE COURT: It is a very serious penalty if you are not.
"THE WITNESS: I can prove anything I am saying here, sir. I wouldn't lie to anybody about something like this.
"THE COURT: You didn't pay it personally?
"THE WITNESS: No, sir.
"THE COURT: You never issued a check from the Miami office?
"THE WITNESS: No, sir, because it was the responsibility—If you understand it, it's a unusual thing. We have this main office and everything had to go through there.
"THE COURT: Apparently, on these books most of the stuff did not go through there.
"THE WITNESS: It had to, sir.
"THE COURT: On those books it indicated that it went through the Miami office. Now, which is right? Thousands and thousands of dollars are reflected in those books. It evidently went through the Miami office.
"THE WITNESS: A good portion went through New York, sir.
"THE COURT: You paid out the money here, though, didn't you?
"THE WITNESS: I don't know how to explain this to you sir; but part of my defense in that there were moneys that were kept in New York—great sums of money that were kept in New York supposed to be sent to me in Florida for my operation here and my attorney will bring it out. I haven't hidden a thing. I have told these men everything when they came to the office, sir.
"THE COURT: That's not the question. They said you gave them the books. The question is simply whether you made a return or not. Go ahead."

3. The case is therefore distinguishable from Gomila v. United States, 146 F.2d 372 (5 Cir. 1944), where the court asked similar questions under less provocative circumstances and then instructed the jury that the presumption of innocence was not intended to aid one who was in fact guilty.

4. For example, appellant's brief states that the trial court characterized certain payments made by Hellman Funeral Chapels, Inc., to various doctors as "bribes." We feel that the appellant's brief is misleading on this point. The books of the corporation showed that certain payments had been made to doctors in the Miami area. The Internal

ror in the restrictions placed on his cross-examination of the Government agent who had made the computation of appellant's individual income tax. This computation had been accomplished by reclassifying certain personal expenditures which were recorded on the books of Hellman Funeral Chapels, Inc. The Government introduced all the books of the corporation into evidence. The revenue agent then introduced his calculations and explained how he had reclassified various categories of expenses shown on the corporate books. On cross-examination, the appellant's attorney attempted to question the agent about the handling of individual items of expense. In connection with this line of questioning, the attorney for the appellant requested the agent to point out in the books of the corporation each item of expense and explain the reason for its reclassification. The court refused to permit this extended cross-examination, and we think he acted within his discretion in so doing. The jury had all the corporate books before them, and had access to the internal revenue agent's calculations. The agent testified as to his reasons for making the reclassifications, and it would have unnecessarily prolonged the trial to require that the witness point to each separate item in the books of the corporation and explain his reason for charging that particular item as personal income to the appellant.

█ The trial court did not abuse its discretion in refusing to require the production of certain work sheets in the possession of the Government upon appellant's motion pursuant to Rule 16, Fed.R.Crim.P. The motion, which was not made until the trial was nearly completed, was untimely, and no showing of materiality was made which would justify a probable delay to afford time for their inspection at that late stage.

As indicated, we have carefully considered all that transpired during the trial of this case as reflected by the record. The testimony of the defendant indicates that he was a difficult witness at times.[5]

Revenue agent testified that he had charged these items as income to the appellant because payments from funeral homes to doctors are considered unethical. The following discussion of this testimony ensued between appellant's counsel and the Government agent:

"Q. Do you know whether this was a gift to Dr. Unger?

"A. No, sir.

"Q. Do you know whether it was entertainment for Dr. Unger?

"A. No, sir.

"Q. Do you know whether it was a deductible expense to Dr. Unger as a corporation?

"A. I think it is a violation of the code of ethics of funeral parlors to pay doctors money.

"Q. So you charged it to Mr. Hellman as income to him?

"THE COURT: He has already charged it. Of course, he did.

"THE WITNESS: I charged it.

"BY MR. ROSEN:

"Q. As though he received the money?

"THE COURT: No; he said Dr. Unger received it.

"MR. ROSEN: But he has charged it to Mr. Hellman.

"THE COURT: As a personal expense—I am pretty sure he doesn't know what all these items went for. He said *if it was for a bribe*, it was against the ethics and he didn't think that would be true." (Emphasis added.)

5. At one point when the defendant was being questioned about a loan, he made the following response to Government counsel:

"A. You tell me, Make believe you were me and I wasn't here. Haven't you had enough from my heart? What do you want from me? They have harrassed me so much, your Honor. When I was in the hospital under oxygen they came after me—"

\* \* \* \* \*

"Q. Did you borrow—

"A. Will you give me a chance, please, and stop harrassing me. I will tell you anything you want to know."

At one time the defendant was cautioned by his own counsel:

"Q. Why were the payments made back to the bank not from you personally?

"A. Because that was interest payments made to the bank, and the corporation had to pay the money back.

We are impressed by the fact that the trial court permitted the defendant great latitude in testifying. He described his personal illnesses and the suffering and apprehension he had experienced as the result of a heart condition. He mentioned his trips to the hospital and testified as to personal family problems and difficulties, including his obligation to his widowed sister and her two children, the illness and death of both his mother and father, and the shortcomings of his brother. During the course of the trial, the court allowed ample time for the defendant to examine and re-examine the books of account. Several recesses were given when the defendant indicated that he was feeling ill and nervous. At the request of the defendant the trial was recessed for several days. At one point Government counsel petitioned the court for a mistrial because it was felt that undue sympathy had been generated on behalf of the defendant.[6]

The charge of the court fully informed the jury that they were the sole judges of the facts, and the charge made it clear that the burden of proof rested squarely on the Government to establish guilt beyond a reasonable doubt and to a moral certainty, and the presumption of innocence was properly emphasized. Apparently, the court had discussed its jury instructions with counsel for the Government and the defendant and at the conclusion of the charge inquired of counsel whether any instructions which had been discussed had been omitted. Counsel for the Government and the defendant stated that there were no omissions. The court further inquired whether counsel for the Government or the defendant desired a further conference concerning instructions. Counsel for both parties answered in the negative. No special charges were requested and no objections were made to the charge that was given by the court.

We have carefully considered the remaining allegations of error, and we conclude that they are without merit. The judgment is affirmed.

---

As it is, it hasn't paid anything else except those two payments and I am still responsible to make those moneys good. If you want to know the story of my life, I took over the business—
"MR. ROSEN: Mr. Hellman, please."
Again, when being questioned with respect to expenditures for his own wedding party, the defendant gave the following answers:
"Q. February, 1958, there were five checks issued to the Eden Roc Hotel in the sum of $1,050.00. What was that for?
"A. I had many people in Miami Beach—
"THE COURT: What was it for?
"THE WITNESS: That is what I am trying to explain to you. I can't talk as well as you can. If I could, I would be a lawyer.
"THE COURT: Answer the question.
"THE WITNESS: It was an affair that was held."

6. "MR. FOOSANER: The Government respectfully petitions this Court that for the reason that several members of the jury viewed the defendant, Mr. Hellman, lying down in one of the rooms in the Federal Court House Building and also inquiring as to the state of his health, the Government's position is prejudiced and a request for a mistrial is made.
"THE COURT: The request will be denied. The request for a recess will be granted."